836          66 Mass. App. Ct. 836 (2006)

The General Convention of the New Jerusalem in the United States of America, Inc. *v.* MacKenzie.

THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., & others[1] *vs.* EDWARD MACKENZIE & others.[2]

No. 05-P-521.

Suffolk. March 3, 2006. - July 26, 2006.

Present: GREENBERG, DUFFLY, & KATZMANN, JJ.

Further appellate review granted, 447 Mass. 1111 (2006).

*Religion. Constitutional Law,* Freedom of religion. *Jurisdiction,* Ecclesiastical controversy. *Consumer Protection,* Availability of remedy. *Charity. Attorney General. Res Judicata.*

In an ecclesiastical dispute alleging several causes of action against a local congregational church (local church), the judge correctly concluded that the First Amendment to the United States Constitution prohibited the trial court's exercise of jurisdiction over certain counts alleging fraud or other wrongdoing in the admission of new members, where consideration of those counts would encroach impermissibly on matters of religious doctrine, canon law, polity, discipline, or ministerial relationships [838-840]; however, the First Amendment did not bar the court's consideration of claims involving the interpretation of a provision of the local church's by-laws to resolve a property dispute [840-841], and where the plaintiff had set forth a viable and substantial basis for those claims, the judge erred in ruling that no basis for relief existed [841-843], but correctly dismissed other subsidiary claims on various grounds [843-844].

CIVIL ACTION commenced in the Superior Court Department on August 4, 2004.

Motions to dismiss were heard by *Patrick F. Brady,* J., and entry of judgment was ordered by *Catherine A. White,* J.

*Lawrence R. Kulig* (*Damon P. Hart* with him) for the plaintiffs.

*Nicholas B. Carter* for the defendants.

[1]The Massachusetts Association of the New Jerusalem (Swedenborgian), and George Chapin.

[2]Thomas Kennedy; Boston Society of the New Jerusalem, Incorporated; and Bostonview Corporation.

GREENBERG, J. A by-law of the congregational[3] Boston Society of the New Jerusalem, Incorporated (Swedenborgian) (the local church), directs that "[i]n the event that the [local church] shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America" (the General Convention). The question put is whether, thus phrased, a "vote of disaffiliation" by a majority of the members of the local church establishes claims for relief against the local church on behalf of the General Convention to recover church assets. There are subsidiary issues concerning the validity of the General Convention's claims pursuant to the Federal Racketeer Influenced and Corrupt Organizations Act (RICO),[4] as well as claims for membership fraud and asset mismanagement, and claims pursuant to G. L. c. 93A against the local church and the other named defendants.

1. *Background.* We summarize the facts alleged in the amended complaint which, for purposes of reviewing the dismissal of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), we accept as true.[5] *Nader* v. *Citron,* 372 Mass. 96, 98 (1977). We do not purport to make a determination whether the facts alleged, and which we recite, are credible or susceptible of proof at trial.

The General Convention alleges that the local church has

---

[3]The Swedenborgian church is a congregational, rather than a hierarchical, church. For a discussion of the distinction between these two organizational structures, see, e.g., *Callahan* v. *First Congregational Church of Haverhill,* 441 Mass. 699, 704-709 (2004).

[4]The instant case was originally commenced in Federal District Court, with the RICO claims providing the basis for Federal jurisdiction. After a Federal District judge dismissed the RICO claims with prejudice, the case was remanded to the State court.

[5]The motions to dismiss — separate motions were made by the local church and the individual defendants — recite a jurisdictional challenge made pursuant to Mass.R.Civ.P. 12(b)(1), 365 Mass. 754 (1974), as well as a challenge pursuant to Mass.R.Civ.P. 12(b)(6). The defendants did not submit any affidavits in support of their motions. Therefore, the motions are a " 'facial attack' based solely on the allegations of the complaint, taken as true for purposes of resolving the [motion]." *Hiles* v. *Episcopal Diocese of Mass.,* 437 Mass. 505, 516 n.13 (2002). The special procedures pertaining to the resolution of motions raising factual issues pursuant to rule 12(b)(1) are not invoked. For a discussion of these procedures, see, e.g., *Callahan* v. *First Congregational Church of Haverhill, supra* at 709-710; *Wooten* v. *Crayton, ante* 187, 190 n.6 (2006).

been affiliated with the General Convention since 1818. Sometime after 2002, the individual defendants, Kennedy and MacKenzie, became associated with the local church and its pastor. It is alleged that through a variety of nefarious means orchestrated by MacKenzie, they seized control of the local church's assets, caused the church to admit members in violation of the church by-laws and religious precepts, and looted the church's assets.[6] Finally, it is alleged that in October, 2003, Kennedy and MacKenzie improperly caused the local church to disaffiliate from the General Convention by fraudulently enrolling unqualified new church members to rig the vote for the disaffiliation. The General Convention's amended complaint includes several causes of action, the primary one for declaratory relief alleging that, because the local church has "ceased to exist" under its by-laws, the local church's assets are to revert to the General Convention to be held in trust until another church affiliated with the General Convention can be established.

Facing that question, a Superior Court judge, pursuant to motions to dismiss, ruled, among other things, that the phrase "cease to exist" does not mean disaffiliation and dismissed the amended complaint. He also ruled that the General Convention and other named plaintiffs lacked standing to pursue their other claims. The motion judge also concluded that resolution of the claims for "fraud or other wrongdoing in the admission of new members . . . would necessarily intrude into matters of religious doctrine."

2. *Jurisdictional issue.* The threshold question facing the motion judge and this court today is whether this dispute properly belongs in the civil courts of the Commonwealth. We begin our discussion with the long-recognized principle that "the First Amendment [to the United States Constitution] prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization." *Alberts* v. *Devine*, 395 Mass. 59, 72, cert. denied sub nom. *Carroll* v. *Al-*

---

[6]The office of the Attorney General investigated these allegations and entered into a consent judgment with the church. In essence, that judgment placed the church under the Attorney General's oversight until 2007 through the appointment of an interim chief financial officer who makes quarterly reports to the Attorney General's office. The judgment did not remove either Kennedy or MacKenzie from their positions in the church.

*berts*, 474 U.S. 1013 (1985), and cases cited. The judge relied on the recent Supreme Judicial Court case of *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699, 708-709 (2004) (hereafter *Callahan*), for the proposition that consideration of some of the counts presented here would impermissibly encroach on church decisions that involve "matters of doctrine, canon law, polity, discipline, and ministerial relationships." *Id.* at 708, quoting from *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 579 (2002). For its part, the General Convention correctly says that the *Callahan* case leaves room for the justiciability of property disputes that arise within both congregational and hierarchical churches. *Callahan, supra* at 700-701. In the recent case of *Wooten* v. *Crayton, ante* 187 (2006) (hereafter *Wooten*), we interpreted the *Callahan* case as not negating jurisdiction in all aspects of "a dispute between factions competing for control of a congregational church." *Id.* at 195.

As settled by *Callahan*, judicial intervention may extend only to matters that do not involve religious "doctrine, canon law, polity, discipline, and ministerial relationships." *Callahan, supra* at 708, quoting from *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. at 579. Callahan, who had been the interim minister of the First Congregational Church of Haverhill, alleged that the defendant church breached its employment contract with him by not following its "own written procedures in carrying out [its] investigation and disciplinary proceedings" against him. *Callahan, supra* at 712-713. The court, however, refused to enter that thicket because "a church must be free to decide for itself what its obligations to its ministers are, without being subject to court interference." *Ibid.*, quoting from *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. at 581. Further, the court observed that the "assessment of an individual's qualifications to be a minister, and the appointment and retirement of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other State interference." *Id.* at 715, quoting from *Alberts* v. *Devine*, 395 Mass. at 72-73.

Here, the General Convention, acting through its former church leaders, asks, in its counts alleging membership fraud,

for judicial review of the church's admission and recognition of new members. We may not undertake this analysis because of the absolute First Amendment protection recognized by *Callahan* and the long tradition of separation of church and State which preceded and informed the case. In this regard, the motion judge's reliance on *Callahan* was correct.

That conclusion, however, does not end our inquiry. The First Amendment does not prohibit the courts from deciding a property dispute involving a church as long as the courts do not intrude upon issues of church doctrine. See *Jones* v. *Wolf*, 443 U.S. 595, 602 (1979), quoting from *Maryland & Va. Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring) ("[A] State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith").[7] Therefore, as long as the court refrains from delving into matters of church doctrine, polity, and internal operation, the First Amendment does not prohibit the court from exercising jurisdiction over property disputes.

As we have noted, the amended complaint sets out numerous causes of action, the most important of which is a declaratory judgment claim (count I) that the local church's by-laws require that, upon disaffiliation, the church's assets are to revert to the General Convention to be held in trust until another church affiliated with the General Convention can be established. We conclude this count presents an issue that is not barred from the

---

[7]*Jones* v. *Wolf, supra,* does not, however, require a court to settle property disputes within a church, and we emphasize that, pursuant to our decision in *Wooten,* such disputes should be examined only to the extent that it is necessary to determine "where church authority is vested" or "whether that authority has expressed its will." *Wooten, supra* at 198.

In this case we have refused to inquire into the allegations of membership fraud and mismanagement, as consideration of these would wade impermissibly into an interpretation of church doctrine. See *infra.* However, unlike *Wooten,* there is a provision of the by-laws in this case that is ambiguous, and in the absence of a supervising church to interpret this provision, further court intervention is permissible. See *Wooten, supra* at 197 ("By definition, a congregational church can turn to no supervising church institution to adjudicate the conflict. Thus, court intervention may be the only viable means for the parties to resolve their differences").

court's consideration by the First Amendment. To the extent it is permitted by the First Amendment, church by-laws are to be interpreted in the same manner as any ordinary contract. See *Mitchell* v. *Albanian Orthodox Diocese in America, Inc.*, 355 Mass. 278, 282 (1969).

Our conclusion is fortified by our recent decision in *Episcopal Diocese of Mass.* v. *DeVine*, 59 Mass. App. Ct. 722, 728 (2003), where we upheld the exercise of jurisdiction over a claim to enforce a diocese's own determination with respect to the parish church. We reiterated that although the First Amendment does not grant judicial authority to intervene in nonsecular disputes within a church, "[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Ibid.*, quoting from *Jones* v. *Wolf*, 443 U.S. at 602.

3. *The by-laws.* As the basis for dismissal of count I of the amended complaint, the motion judge concluded that the "plain language" of art. X, § 3, of the by-laws governing transfer of the local church's assets to the General Convention applies only if the local church shall "cease to exist," but not if it disaffiliates from the General Convention.[8] On this basis, he ruled that no claim for relief exists because the assets remain under the lawful control of the newly elected lay leaders. For its part, the General Convention argues that the ruling is erroneous because the judge misconstrued the by-laws. There is an additional

---

[8] Article X of the church by-laws reads in pertinent part as follows:

"Section 3. Dissolution

"In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.

"These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedenborgian) Church within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution."

contention, not argued below, that even if the by-laws do not explicitly provide for a reversion to the General Convention, a trust should be implied to accomplish the same result. We need not reach this latter question because the failure to raise the issue below constitutes a waiver, see, e.g., *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass. 562, 565 (1976) (noting that an issue cannot be raised for the first time on appeal), and, as will be seen, the General Convention has set forth a viable and substantial claim of right of ownership of the local church's assets under the by-laws.

On the issue of construing the by-laws, the General Convention argues that the phrase "the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist" in the by-law essentially means cease to exist as a church affiliated with the General Convention. To support the argument, it alleges that art. X, § 3, was added to the by-laws "at the time when the General Denomination feared the church and its assets could be the subject of a takeover from a rival denomination known as the General Church." The local church, it alleges, "added this provision to ensure that the Church's assets would remain with The General Convention for the establishment of a new affiliated church should disaffiliation ever occur."

While the motion judge determined that the by-law was unambiguous as a matter of law, we disagree. It is settled by our decisions that "language is ambiguous where 'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken.' " *Post* v. *Belmont Country Club, Inc.*, 60 Mass. App. Ct. 645, 652 (2004), quoting from *Fashion House, Inc.* v. *K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). In this case an ambiguity is present because the term "cease to exist" is "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *County of Barnstable* v. *American Financial Corp.*, 51 Mass. App. Ct. 213, 215 (2001). See *Vezina* v. *Mahoney & Wright Ins. Agency, Inc.*, 40 Mass. App. Ct. 218, 223 (1996) ("The word was not defined . . . , and the judge properly treated it as ambiguous and subject to elucidation from the circumstances").

The bottom line here is that where the provision is ambiguous, i.e., in reference to "ceasing to exist" and escrowing the assets of the local church for the establishment of another church affiliated with the General Convention, the fact finder is obligated to examine the subject matter of the particular by-law, the language employed, its context, and its history to ascertain the objectives that were to be accomplished. See, e.g., *Haverhill v. George Brox, Inc.*, 47 Mass. App. Ct. 717, 720 (1999); *Cabot v. Cabot*, 55 Mass. App. Ct. 756, 761 (2002). As we determine that there is some ambiguity in the dissolution provision of the by-laws in the instant case, and then taking all the allegations in the relevant portions of the amended complaint as true and drawing inferences therefrom in the plaintiffs' favor,[9] the amended complaint should survive a motion to dismiss on the first two counts.[10]

4. *Other claims.* Standing on a different footing, however, are the allegations in the amended complaint of violations of G. L. c. 93A and RICO, as well as claims for fraud and mismanagement. We agree with the motion judge's determination that G. L. c. 93A does not apply to noncommercial, intraorganizational disputes. See, e.g., *Riseman v. Orion Research Inc.*, 394 Mass. 311, 313-314 (1985) (no G. L. c. 93A claim when dispute concerned internal corporate governance); *Zimmerman v. Bogoff*, 402 Mass. 650, 662-663 (1988); *Szalla v. Locke*,

[9]Attached as an exhibit to the original complaint is the affidavit of John Perry. Although the defendants contend that we may not consider the affidavit, "(i)n evaluating a rule 12(b)(6) motion, we take into consideration 'the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.' " *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000). See *Yarde Metals, Inc. v. New England Patriots Ltd. Partnership*, 64 Mass. App. Ct. 656, 657 n.1 (2005). The affidavit of John Perry states, in pertinent part: "I was involved with the Church's adoption of this provision when it was added to the bylaws . . . . The provision would be triggered if the Church disassociated itself, in any way, from The General Convention. In such a situation, the assets of the Church were to be returned to the General Convention for the establishment of another General Convention Swedenborgian Church in Boston. . . . The Church did not intend that the provision would be triggered only if it lost all members or ceased operating altogether."

[10]Count II is a count for conversion against the individual defendants MacKenzie and Kennedy, premised on the proposition that MacKenzie and Kennedy wrongfully converted assets of the General Convention to their own use. This count also survives the 12(b)(6) motion to dismiss.

421 Mass. 448, 451-452 (1995); *Newton* v. *Moffie*, 13 Mass. App. Ct. 462, 469-470 (1982) (no G. L. c. 93A claim where dispute was between partners, particularly where claim does not affect the public interest).

With respect to the remaining claims that deal with either the alleged mismanagement or misappropriation of local church assets by the individual defendants or with the admission by them of "unqualified" church members, the motion judge correctly concluded that these claims were either preempted by the Attorney General's superintendence of charitable organizations and trusts, *Weaver* v. *Wood*, 425 Mass. 270, 275-278 (1997), cert. denied, 522 U.S. 1049 (1998), or required a consideration of church doctrine and are not justiciable under the *Callahan* case.

We agree with the motion judge's decision concerning the RICO claims that were dismissed with prejudice in the Federal District Court for failure to allege a pattern of racketeering activity. They are barred from reconsideration by the principle of res judicata. See *Lawlor* v. *National Screen Serv. Corp.*, 349 U.S. 322, 326-327 (1955) (res judicata applies where plaintiffs sue upon same cause of action litigated between the parties in a prior suit).

Chapin, as an individual plaintiff, claims that he has standing to pursue a claim of vote dilution because his interests in this claim are "distinct from any member of the public," quoting from *Weaver* v. *Wood*, 425 Mass. at 277. However, his claim rests in the alleged improper admission of new members. If we were to reach that claim, it would necessarily require an examination of the qualifications and admission of new members, which is prohibited under the First Amendment.

Accordingly, the allowance of the motions to dismiss is reversed as to counts I and II, insofar as the amended complaint states a claim cognizable under the local church's by-laws. That claim is remanded for further proceedings consistent with this opinion. The dismissal of the remaining counts (counts III through XI) is affirmed.

*So ordered.*